# IN THE CRIMINAL COURT OF APPEALS OF TENNESSEE

## AT JACKSON

### DECEMBER 1997 SESSION



**FILED**

**March 27, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 02C01-9707-CC-00294 |
| | ) | |
| vs. | ) | Lauderdale County |
| | ) | |
| **ROGER HOSTETLER,** | ) | Honorable Joseph H. Walker |
| | ) | |
| Appellant. | ) | (Criminally Negligent Homicide) |
| | ) | |

FOR THE APPELLANT:

MR. MICHAEL W. WHITAKER
P.O. Box 1024
Covington, TN 38019

FOR THE APPELLEE:

MR. JOHN KNOX WALKUP
Attorney General & Reporter

MS. ELIZABETH T. RYAN
Asst. Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

MR. MARK DAVIDSON
Asst. District Atty. General
Lauderdale County Justice Center
675 Highway 51 South
Ripley, TN 38063

MR. JAMES W. FREELAND
Asst. District Atty. General
Lauderdale County Justice Center
675 Highway 51 South
Ripley, TN 38063

OPINION FILED: _____

**AFFIRMED**

**CURWOOD WITT, JUDGE**

## OPINION

The defendant, Roger Hostetler, was convicted in the Lauderdale County Circuit Court on October 30, 1996, of criminally negligent homicide. The trial court sentenced the defendant to serve one year in the Department of Correction and imposed a fine of $3,000. The defendant, appealing from the conviction, presents two issues for review:

1. whether there was sufficient evidence to convict him of criminally negligent homicide, and

2. whether he was denied due process of law because of the state's spoliation of evidence.

After a thorough review of the record, the briefs, and the arguments of the parties, we affirm the judgment of the trial court.

The victim, Mattie Drake, and her husband, William Drake, both in their eighties, lived near Ripley in Lauderdale County. The defendant was their neighbor. The defendant's residence was situated to the rear and to the side of the Drake residence so that the rear of one property faced the rear of the other. The residences were about 75 yards apart. The defendant's residence was a mobile home surrounded by a wire fence approximately six feet high. The defendant kept Rottweiler dogs within the fenced enclosure.

The proof shows that, in addition to the three Rottweilers kept by the defendant on March 8, 1996, as many as four or five other Rottweilers lived in the general area, which included a subdivision located behind the Drake property and beyond the defendant's property.

The Drakes' son, James Drake, operated an automobile repair shop 200 or 300 yards down the highway from the Drake home. Mattie Drake was an active lady at the age of 85, but William Drake, her husband, was blind.

William Drake testified that in January, 1996 Mattie was outside the

couple's back door when she was attacked by a dog. She was able to move back inside the door, away from the animal, but not before she sustained bites on her hip and arm which required hospital treatment. William Drake believed that the dog responsible for the attack belonged to the defendant. After the January incident, he called the defendant and asked him to keep his dogs confined. Mr. Drake told the defendant that he and his wife enjoyed spending time in their yard and could not tolerate a fear of being attacked by dogs. They "didn't want to have to be worried about them every time [they] went out in the yard." Mr. Drake testified that the defendant said he was sorry and agreed to try to keep his dogs up. The defendant, however, testified that he never acknowledged that the dog that attacked Mattie Drake in January was his.

On the morning of March 8, 1996, the defendant returned home from his truck-driving job at 5:00 a.m. His three Rottweilers, Maxine, Max, and Max's sire, Damien, were present within the fenced enclosure. A couple of hours later, Mattie Drake went outside her house, and after a while, Mr. Drake heard Mattie scream, "Bill! Bill! The dogs have got me!" Mr. Drake went outside but, due to his blindness, had to try to locate his wife from sound. He heard dogs "growling, barking," located the victim, and tried to help her stand. When she informed him that she could not get to her feet, he knew he had to summon help. Being unable to see the edge of the patio, the steps, and other obstacles, Mr. Drake crawled back into the house on his hands and knees and called his son's shop.

James Drake's wife answered the call and relayed it to James, who left the shop immediately and drove the short distance to the Drake home. Upon arriving, he saw his mother lying in the front yard with two dogs on her. He identified them as two young Rottweilers. He fired two or three shots from a gun to run off the dogs, and they ran around the house toward the rear. He found his mother in dire condition. Her pants and shoes had been pulled off and were covered in blood. He testified that her "left ear had been torn off, and she had

3

several bite wounds on her head and face. There were several open wounds on her right side and her legs and [sic] had bitten through to the bone." He stated, "You could see the bones from her knees clear to her ankles on both legs." She was conscious but not coherent. James Drake obtained a blanket for his mother and called 911. After medical help arrived, James Drake discovered that William Drake appeared to be in shock and was bloody from dog bites on his arm.

While being cared for in a Memphis hospital two days later, Mattie Drake died from her injuries. William Drake recovered from his injuries.

James Jackson, a neighbor of the Drakes who arrived on the scene just after James Drake had covered the victim with the blanket, testified that approximately three or four weeks before the fatal attack on Mrs. Drake, one of the defendant's dogs came into Mr. Jackson's yard. Mr. Jackson had started his riding lawnmower in order to maintain the battery, and he was concerned enough about the dog's presence that he drove his mower to his house where he phoned the defendant. The defendant retrieved the dog, and the dog obediently returned to the enclosure at the defendant's commands.

In addition to medical personnel who answered the call to the Drake residence on the morning of March 8, Wade Hendren (a Tennessee Wildlife Resources Officer), Sheriff Ron Rickard, Emory Kissell (a rabies control officer), and Deputy Sheriff Lucian Herron arrived at the scene. Hendren and Kissell went to look for the dogs that attacked the victim. Hendren testified that Kissell said he knew where the dogs lived. They drove around to the defendant's house. They saw three Rottweilers in the front yard inside the fence. The two younger dogs appeared to be wet around their necks and shoulders. One of these dogs had blood on its muzzle. When the defendant came out of his house, he ran his hand under Max's chin and "come up with a hand full of blood." The dogs were gentle with the defendant, and the defendant voluntarily loaded Max and Maxine into

Kissell's truck. Later, the defendant signed a form to consent to the dogs' euthanization. They were transported to a veterinarian where they were euthanized. Sheriff Rickard obtained samples of stained hair from each dog and later directed that samples of the contents of the dogs' stomachs be preserved as possible evidence.

Sheriff Rickard testified that on the morning of March 8, after the attack on the victim, he inspected the defendant's fence. He saw an area that "appeared to us that because of debris that was cleared that something had been going underneath the fence area, in and out." A sawhorse was lying on its side inside the fence so that its cross-member stretched along the undercut area. He also found a second place where a smaller passage had been made through the fence. Kissell testified that the larger undercut area looked as if "dogs had been in and out." Pictures of the area showed the bottom edge of the wire bent to the outside.

James Drake testified the two Rottweilers he saw on his mother on March 8 looked like the same dogs he had seen inside the defendant's fence when he mowed his parents' lawn; however, he could not testify positively that the dogs he saw on March 8 <u>were</u> the same ones he had seen in the defendant's lot. He acknowledged that another neighbor, Terry Mann, owned a Rottweiler which Mann kept chained to a tree. He also acknowledged that the subdivision that had developed behind the Drake place contained a number of trailers and houses. James Jackson testified that a neighbor of the defendant, a Mr. Willis, kept a Rottweiler. Terry Mann testified that he had never owned a Rottweiler but that Willis, another neighbor, did. Mann testified that Willis kept his Rottweiler chained to a tree. He acknowledged that several other Rottweilers may have lived in the general area at the time. Mann testified that he had lived there seventeen years and had seen the defendant's dogs out only twice.

5

The defendant testified that, during the sixteen years he had lived at that address, his dogs had gotten out only twice prior to March 8, 1996. He testified that, besides his dogs, there were five or more Rottweilers in the area, and some of these ran loose. However, he agreed that he was the only dog owner in the area who had more than one Rottweiler. He stated his own dogs were well-tempered and affectionate and that he had previously owned a pit bulldog that he got rid of because of its unstable temperment. He testified he placed the sawhorse across the undercut area to prevent an estrus Pomeranian from coming into the pen.

There was no proof of any violent characteristic of Rottweilers as a breed. However, the defendant testified that his Rottweilers were large, powerful dogs. Max weighed approximately 135 pounds, and Maxine weighed approximately 100 pounds.

Emory Kissell testified he investigated the January attack on Mattie Drake. He inspected the defendant's fence after the attack, and when he was there, a hired man was working on the fence cleaning away vegetation or perhaps a fallen tree. Kissell said the two dogs he took in March appeared to be two of the three that were present in January. In January, he told the defendant that he should keep the dogs chained inside the fence enclosure, and he believed the defendant followed this advice for a while.

Sheriff Rickard testified that he never sent the bag of the dogs' stomach contents to be analyzed. He kept the bag in a refrigerator for a long time, and when he learned that the district attorney's office had expressed little interest in it, he ignored the bag. He believed it was later thrown away by someone at the jail. A TBI laboratory technician testified that she could have tried to analyze the material that had been extracted from the Rottweilers' stomachs, but she stated that her ability to identify the material depended upon how it had been stored and the condition it was in when analyzed. The veterinarian who euthanized the dogs and

6

extracted the stomach material testified that the female's stomach contained only dog food. He testified he found in the male's stomach small fragments of some unknown tissue, in addition to dog food. From merely a visual inspection, he could not identify the fragments as human tissue.

The hair samples taken from the euthanized dogs were analyzed. Hair from both dogs was stained with human blood, although the lab performed no blood typing nor any DNA analysis.

## I. __Sufficiency of Evidence of Criminally Negligent Homicide.__

It is well established that a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the theory of the state. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978); State v. Townsend, 525 S.W.2d 842, 843 (Tenn. 1975). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978).

Moreover, a verdict against the defendant removes the presumption of innocence and raises a presumption of guilt on appeal, State v. Grace, 493 S.W. 2d 474, 476 (Tenn. 1973); Anglin v. State, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1977), which the defendant has the burden of overcoming. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977).

Most significantly, where the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2782 (1979); Tenn R. App. P. 13; see also

<u>State v. Williams</u>, 657 S.W.2d 405 (Tenn. 1983).  This rule applies to findings based on both direct and circumstantial evidence.  <u>State v. Thomas</u>, 755 S.W.2d 838, 842 (Tenn. Crim. App. 1988).  Circumstantial evidence alone may be sufficient to convict one of a crime.  <u>State v. Boling</u>, 840 S.W.2d 944, 947 (Tenn. Crim. App. 1992).

"Criminally negligent conduct which results in death constitutes criminally negligent homicide." Tenn. Code Ann. § 39-13-212(a) (1997).  The Code defines "criminal negligence" as follows:

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(d) (1997).

The defendant challenges the sufficiency of the evidence to convict him "when he had no credible notice that his dogs were vicious and when he had used reasonable caution to fence the dogs."  He acknowledges that "apparently without cause [his dogs] savagely attacked, killed and consumed parts of the deceased as she walked in her yard.  The lab analyst said there was human blood on their faces."  Accordingly, he does not challenge the finding that his dogs killed the victim.  Rather, he asserts that, given the evidence of his dogs' lethal attack, he should not have been held criminally liable.

"[C]riminally negligent homicide was created by the General Assembly to replace involuntary manslaughter." <u>State v. Adams</u>, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995).  However, as we noted in <u>Adams</u>, the culpable mental state that is required to sustain a conviction for "criminally negligent homicide is different from what was required to support involuntary manslaughter." <u>Adams</u>, 916 S.W.2d at 474.  Involuntary manslaughter was based on reckless conduct, and under our

8

present code, the difference between reckless and criminally negligent conduct is the "'failure to perceive the risk from one's misconduct.'" Id. (citations omitted). Reckless conduct occurs when the actor "is aware of but consciously disregards a substantial and unjustifiable risk," Tenn. Code Ann. § 39-11-302(c) (1997), whereas criminally negligent conduct occurs when the actor "ought to be aware" of the substantial risk. Tenn. Code Ann. § 39-11-302(d) (1997). Accordingly, "[a]n accused who engages in conduct under circumstances that he or she knows, or should know, will create a 'substantial and unjustifiable risk'" commits an act with criminal negligence. Adams, 916 S.W.2d at 474. Therefore, criminally negligence conduct may be committed with a less culpable mental state than is now required for criminal liability based upon recklessness and than was required for involuntary manslaughter.[1]

Criminal culpability under Tennessee Code Annotated section 39-11-302(d) is grounded upon negligence. Much of law of negligence has developed in the civil law of torts, which serves as a backdrop for understanding the principles that govern criminal negligence. Indeed, criminal liability for negligence is "based on a higher degree of negligence than that required for civil liability. " Tenn. Code Ann. § 39-11-302(d) (1997), Advisory Comm'n Comments (emphasis added). Thus, certain concepts of negligence as used in our tort law inform the analysis of Tennessee Code Annotated section 39-11-302(d).

---

[1]We note the defendant in his brief relies in part on Griffin v. State, 578 S.W.2d 654 (Tenn. Crim. App. 1978). The defendant argues that Griffin supports the claim that an accidental homicide cannot result in criminal liability unless the act was unlawful or performed in an unlawful manner. However, Griffin was decided before the 1989 enactment of our present criminal code. As noted above, the current code section proscribing criminally negligent homicide, which was not present in the pre-1989 law, criminalizes "criminally negligent conduct which results in death." Such conduct entails a "substantial and unjustifiable risk" that the result of death might occur. There is no requirement that the conduct be otherwise unlawful. Moreover, Griffin was a 1977 second-degree murder case. This court was concerned with whether the evidence of Griffin's intoxication, when she killed a constable by striking him with her car, was sufficient to establish malice, an element of second-degree murder at that time. The court determined that the unlawfulness of Griffin's drunken driving served as a basis for implying malice.

The language "ought to have been aware" signals the existence of a duty imposed upon one person to avoid doing harm to another person. Duty depends upon the "foreseeable probability of the harm or injury occurring." McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995). "'[A] risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom it owed a duty is probable.'" Jones v. Exxon Corp., 940 S.W.2d 69, 72 (Tenn. 1996) (emphasis added).

Whether a duty exists "in any given situation is a question of law for the court." Jones, 940 S.W.2d at 72; see also McClung v. Delta Square Ltd., 937 S.W.2d 891, 894 (Tenn. Ct. App. 1996); Jenkins v. CSX Transp, Inc., 906 S.W.2d 460, 463 (Tenn. Ct. App. 1995). In the present case, our law has recognized a duty of a dog owner, who has notice or knowledge of the dog's vicious propensities, to protect other persons from the risk of attack by the dog. Fletcher v. Richardson, 603 S.W.2d 734, 735-36 (Tenn. 1980).

We believe the "standard of care that an ordinary person would exercise" refers essentially to the basic standard that is recognized in tort law and that serves as the conceptual underpinning for all of the other elements that create tortious liability based on negligence. Under our tort law, a standard of care equates to a "scope of a duty" to another person to avoid an unreasonable risk of harm to the other person. See White v. Metropolitan Gov't., 860 S.W.2d 49, 52 (Tenn. Ct. App. 1993) (emphasis added); see also McClung, 937 S.W.2d 891. "[D]uty is the legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm." McCall, 913 S.W.2d at 153 (emphasis added). The "reasonable care" standard is the basic, garden-variety negligence standard applied in Tennessee tort cases. McCall, 913 S.W.2d at 153; Pittman v. Upjohn Co., 890 S.W.2d 425, 428 (Tenn. 1994); Doe v. Linder Const. Co., 845 S.W.2d 173, 177 (Tenn. 1992); Jones,

10

940 S.W.2d at 72 (applying the rule in a premise-liability case). As such, reasonable care is equivalent to the care an ordinary person would exercise. See Jones, 940 S.W.2d at 72 (referring to "'[o]rdinary, or reasonable care'"); Allen v. Bagett, 905 S.W.2d 190, 191 (Tenn. Ct. App. 1995) (characterizing the duty owed by an amusement park operator to its patrons as a duty of "ordinary care"). Moreover, the "substantial and unjustifiable risk" described in the criminal code's definition of criminal negligence is commensurate with "unreasonable risk" that is commonly mentioned in civil negligence cases. See McCall, 913 S.W.2d at 153 (risk is unreasonable if "the foreseeable probability and gravity of harm posed by defendant's conduct outweigh[s] the burden upon the defendant to engage in alternative conduct" or "'if the risk is of such a magnitude as to outweigh what the law regards as the utility of the act'") (emphasis added). Given the approximate equivalence of the "standard of care" in section 39-11-302(d) with the basic standard, or scope of duty, utilized in civil negligence cases, the justification for criminalizing some negligent conduct is supplied by the requirement of a "gross deviation" from the standard and not by any real modification of the standard itself.

Once the duty between the tortfeasor (or defendant) and the plaintiff (or victim) has been established, "the scope of the duty or standard of care is a question of fact to be decided by the trier of fact." Allen, 905 S.W.2d at 191 (emphasis added).

In Fletcher v. Richardson, our supreme court examined the applicable tort rules governing a dog owner's civil liability[2]:

> In this state generally, as in this case, actions to recover damages for injuries resulting from an attack by a dog have been based on negligence of the dog owner in failing to keep his dog securely, when the owner knew or should have known that his dog was vicious or dangerous. However, our courts have voiced the opinion that the mere keeping of an animal, after notice of its vicious propensities, leaves the owner open to liability for injury caused by the vicious

---

[2]The Fletcher court was specifically concerned with the duty of a dog owner's liability to licenses and invitees who are lawfully upon the owner's premises; however, the court's discussion of the general concepts of the owner's duty and the scope of that duty are appropriate to our present analysis.

11

> propensities of the animal . . . . The gist of the action is the keeping of the animal with notice of its vicious disposition, and not the negligence of the owner in its custody.

Fletcher, 603 S.W.2d at 736 (citations omitted). Viewed in this light, the applicable standard of care by which the defendant was bound to Mattie Drake was to save her from harm once he elects to keep the dogs after he "ought to have been aware" of the danger.

A deviation from the standard of care results in tortious negligence, whereas a gross deviation results in criminal negligence liability. Put another way, to resolve the sufficiency question, we must determine (1) whether the defendant was "on notice," or whether the "ought to [have] been aware" of the risk to Mattie Drake, see State v. James Wesley Clanton, No. 01C01-9505-CC-00050 (Tenn. Crim. App., Nashville, July 14, 1995), perm. app. denied (Tenn. 1995), and if so, (2) whether his conduct amounted to a "gross deviation" from the standard.[3]

With these principles in mind, we have reviewed the proof in the light most favorable to the state and allowed the state the strongest legitimate inferences that may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). We hold that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

A few weeks before the lethal attack upon the eighty-five year old victim, a dog or dogs attacked her near her back door, inflicting bites into her arm and hip before she could regain the safety of her house. The defendant knew that this attack occurred, and although he denies that any of his dogs was responsible,

---

[3]In the present case, the defendant stresses that the failure to perceive the risk must be "viewed from the accused person's standpoint." See Tenn. Code Ann. § 39-11-302(d). We do not believe, however, that this phrase injects a totally subjective element into the analysis, such that the defendant is exonerated if he acted in good faith or, in fact, just failed to discern the risk. The fault of an accused under the definition of criminal negligence is a "gross deviation," not from what he or she would have done under the circumstances, but "from the standard of care that an ordinary person would exercise." Tenn. Code Ann. § 39-11-302(d) (emphasis added).

12

he was aware that the guilty dog was of a size and appearance that caused the Drakes to believe that the defendant's dog or dogs attacked Mrs. Drake.

We review first the question of whether the defendant ought to have been aware of his dogs' dangerous propensities. The defendant's argument that it was not proven that any of his dogs participated in the January attack is ineffectual. Although he may not have known for sure that any of his dogs viciously attacked and injured the victim in January, he knew that one or more of his dogs may have been guilty. Moreover, he knew that his close neighbors, the Drakes, had certain physical limitations. They were both elderly, and Mr. Drake was blind. The defendant knew that the Drakes enjoyed being out in their yard and that they were fearful of another dog attack. In addition, he admitted that his Rottweilers were large, powerful dogs. Under these circumstances and in the light most favorable to the state, the defendant, even if he did not believe or know that his dog or dogs attacked the victim in January, was nevertheless on notice of vicious propensities of his dogs, or in other words, "ought to have been aware of a substantial and unjustifiable risk" to Mattie Drake. At the very least, the jury could have reached this conclusion,[4] as was their prerogative. See Allen, 905 S.W.2d at 191.

With respect to whether the defendant grossly deviated from the standard of care required, something more than the decision to harbor the animals is required. See Fletcher, 603 S.W.2d at 736; Tenn. Code Ann. § 39-11-302(d), Advisory Comm'n Comments. Although custodial negligence in this situation might have been immaterial to a finding of tortious liability, Fletcher, 603 S.W.2d at 736, the facts suggesting custodial negligence do support a finding of gross deviation. Sometime prior to March 8, but after the January attack, the defendant became aware that one of his dogs got out and went upon the Jackson property. Also, prior to March 8, an undercut passage appeared on the side of the defendant's fence

---

[4]The jury, as the judge of the credibility of the trial witnesses, may not have believed the defendant when he testified that he did not actually know that his dog or dogs carried out the January attack.

that faced the Drake home.  Although the defendant denies that his dogs could have escaped through this breach under the fence, it is clear that this breach occurred before March 8 and was significant enough that he attempted to block the passage with a sawhorse.  This apparent knowledge of a breach, complemented by the defendant's insubstantial effort to correct it, supports a jury in finding that a gross deviation from the standard of care occurred. Such a finding is justified by the "nature and extent" of the risk to the victim.  At 85 years of age and with an infirm husband, Mattie Drake had no chance against the onslaught of even one 135 pound dog.  The nature and extent of this risk was grave and extreme.

A rational jury could have found, beyond a reasonable doubt, as the jury in the present case found, that the defendant ought to have been aware of a substantial and unjustifiable risk of harm or death to Mattie Drake, and that this risk was of "such a nature and degree that the failure to perceive it constitute[d] a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances," even as viewed from the defendant's standpoint.

## II.  Spoliation of Evidence.

The defendant argues that the Lauderdale County Sheriff's Office's loss of the potentially exculpative evidence retrieved from the stomachs of the defendant's euthanized dogs violated his right to a fair trial.  Such evidence, if exculpative, might tend to show that the defendant's dogs were not the victim's killers.  We review the spoliation issue because we understand that the defendant, although conceding that the evidence supports a finding that his dogs killed the victim, did not concede the fact that his dogs killed her.  Therefore, had the destroyed, possibly exculpatory evidence been available, the defendant may not have been compelled to concede the question of sufficiency of the evidence about whether his dogs were the killers.

14

To put the argument into perspective, we must point out that the corpses of Max and Maxine were the defendant's property. Had he acted in a timely way, he could have opted to retrieve gastric fragments himself, or, upon a timely inquiry, he would have learned that the samples had already been extracted and were available for analysis. Also, according to the testimony of the TBI lab analyst, scientific identification of the recovered fragments may, or may not, have been possible. Furthermore, the veterinarian testified that he found unidentifiable tissue in only one of the dogs. This tissue was small in amount and could not be confirmed as human tissue by his mere visual inspection.

The only authority cited by the defendant is Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), where the United States Supreme Court held that the prosecution has the duty to furnish exculpatory evidence to the accused upon request. Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97. The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. State v. Marshall, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992); Branch v. State, 4 Tenn. Crim. App. 164, 168, 469 S.W.2d 533, 536 (1969).

Before an accused is entitled to relief under this theory, he must establish several prerequisites: (a) the prosecution must have suppressed the evidence; (b) the evidence suppressed must have been favorable to the accused; and (c) the evidence must have been material. See Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97; Workman v. State, 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993); Marshall, 845 S.W.2d at 232; Strouth v. State, 755 S.W.2d 819, 828 (Tenn. Crim. App. 1986). In State v. Spurlock, 874 S.W.2d 602 (Tenn. Crim. App. 1993) (Summers, J., concurring), this court recognized a fourth prerequisite to relief, that "the accused must make a proper request for the production of the evidence, unless

15

the evidence, when viewed by the prosecution, is obviously exculpatory in nature and will be helpful to the accused." Spurlock, 874 S.W. at 609 (citations omitted).

Initially, we note that the tissue samples do not constitute materially exculpatory evidence under Brady. Rather, the evidence falls within the class of "potentially exculpatory evidence," if that. See Arizona v. Youngblood, 488 U.S. 51, 57, 109 S. Ct. 333, 337 (1988).

In Youngblood, the Supreme Court held that the failure of the prosecution to preserve evidence which is potentially useful to the defendant may constitute a denial of due process of law, if the defendant can show bad faith on the part of the police. Youngblood, 488 U.S. at 58, 109 S. Ct. at 337. This court has followed the majority opinion in Youngblood. State v. Eldridge, 951 S.W.2d 775, 778 (Tenn. Crim. App. 1997); State v. Jefferson, 938 S.W.2d 1, 16 (Tenn. Crim. App. 1996); Robert Lloyd Wiggins v. State, No. 03C01-9605-CC-00191, slip op. at 31 (Tenn. Crim. App., Knoxville, Mar. 20, 1997), perm. app. denied (Tenn. Sept. 29, 1997); State v. Jerry Douglas Franklin, No. 01C01-9510-CR-00348, slip op. at 8 (Tenn. Crim. App., Nashville, Feb. 28, 1997), perm. app. denied (Tenn. Nov. 17, 1997). But see State v. Marvin K.. Ferguson, No. 03C01-9406-CR-00235, (Tenn. Crim. App., Knoxville, July 17, 1997) (Wade and Tipton, JJ., concurring), pet. for perm. app. filed (Tenn. Aug. 3, 1997) (in separate opinions, majority of panel indicate the Youngblood majority opinion does not meet all due process concerns under the state constitution).

Under Youngblood, the defendant is not entitled to relief. The record does not reflect that the sheriff's office acted in bad faith in destroying the tissue samples. We conclude that the state's failure to preserve the tissue samples did not violate the defendant's due process rights.

In conclusion, we find the defendant's issues without merit. Accordingly, the judgment of the trial court is affirmed.

_____
CURWOOD WITT, JUDGE


CONCUR:


_____
JOE B. JONES, PRESIDING JUDGE


_____
JERRY L. SMITH, JUDGE